**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**McALLEN DIVISION**

LYLIANA SALINAS,

                    Plaintiff,

    v.

FORD MOTOR COMPANY,

                    Defendant.

_____/

Case No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Lyliana Salinas, on behalf of herself and all other persons similarly situated brings this action against defendant, Ford Motor Company and, to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, alleges as follows:

## NATURE OF THE ACTION

1.    This case arises from Ford's sale and lease of several hundreds of thousands of Explorer model vehicles that Ford knew or should have known are defective such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles. The potential exposure to exhaust and carbon monoxide renders these vehicles unsafe to drive.

2.    Ford's Technical Service Bulletin 12-12-4 ("TSB 12-12-4"), titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on. Customers may indicate the odor smells like sulfur."  Ford's TSB 12-12-4 provides

1

instructions which Ford claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

3.      Subsequent to TSB 12-12-4, Ford issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

4.      Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles, and adds the 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

5.      Ford's TSBs 12-12-4 and 14-0130, however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles. Ford's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, and do not directly notify non-Ford automotive repair facilities about the defects associated with TSBs 12-12-4 and 14-0130. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, and it developed a purported fix to the problem, Ford provided no notice to plaintiff or the proposed class members about the defect and the potential exposure to lethal carbon monoxide in 2011 through 2015 model-year Ford Explorers.

6.      Upon information and belief, Ford sold or leased hundreds of thousands of defective vehicles nationwide. Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

2

7.      Ford designed, manufactured, sold and leased the 2011 through 2015 model year Ford Explorers when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify plaintiff and the proposed class members of the defect in the 2011 through 2015 model year Ford Explorers that exposed plaintiff, the proposed class members, and others, to a life-safety hazard.

8.      Plaintiff and the members of the proposed class reasonably expect to operate their Ford Explorer vehicles in a normal and customary manner free from exposure to potentially deadly gases.

## JURISDICTION AND VENUE

9.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the class is diverse from Ford.

10.     The Court has personal jurisdiction over Ford because Ford conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District, and caused harm to class members residing in this District.

## PARTIES

12.     Plaintiff, Lyliana Salinas, is a resident of Hidalgo County, Texas.

13.     Defendant, Ford Motor Company, is a Delaware corporation with its principal place of business in Michigan.  In this Complaint, "Ford" refers to the named defendant and all related, successor, predecessor, parent, and subsidiary entities to which these allegations pertain.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

14.     In about September 2014, plaintiff bought a certified pre-owned 2013 Ford Explorer Sport, VIN number 1FM5K8GT7DGC69961, from an authorized Ford dealership in Mission, Texas.

15.     The 2013 Ford Explorer purchased by plaintiff was dangerous and defective when purchased because its design and exhaust and/or HVAC systems permitted an exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle.  The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection.

16.     At the time of the purchase, plaintiff was not notified that the 2013 Ford Explorer she purchased was defective, nor was she notified that she and all occupants would be exposed to carbon monoxide and other potentially dangerous gases while driving in her 2013 Ford Explorer during its normal and customary use.

17.     Plaintiff brought her 2013 Ford Explorer in for service to authorized Ford dealerships on numerous occasions, with complaints of an exhaust odor present in the passenger compartment while the 2013 Ford Explorer was in use.

18.     On about September 30, 2014, plaintiff brought her 2013 Ford Explorer in for service to an authorized Ford dealership in Edinburg, Texas.  The authorized Ford

dealership verified plaintiff's complaint of an exhaust odor in the passenger compartment of the vehicle.  The authorized Ford dealership prescribed and performed TSB 14-0130, which was intended to correct the problem.

19.     The authorized Ford dealership in Edinburg, Texas, informed Plaintiff that Ford was aware of the exhaust odor problem but did not know how to fix the problem.

20.     Plaintiff continued to smell exhaust in the passenger compartment of her 2013 Ford Explorer after TSB 14-0130 was performed.

21.     On about November 24, 2014, plaintiff brought her 2013 Ford Explorer in for service to an authorized Ford dealership in Weslaco, Texas.  The authorized Ford dealership verified plaintiff's complaint of an exhaust odor in the passenger compartment of the vehicle.  The authorized Ford dealership prescribed and performed TSB 14-0130, which was, for a second time, intended to correct the problem.

22.     On about December 8, 2014, plaintiff picked up her 2013 Ford Explorer from the authorized Ford dealership in Weslaco, Texas.  While on her drive home from the dealership, plaintiff experienced the exhaust odor inside the vehicle.  Plaintiff turned around and returned to the authorized Ford dealership in Weslaco, Texas.  Service personnel from the authorized Ford dealership conducted test drove the vehicle, and again verified plaintiff's complaint of an exhaust odor inside the passenger compartment of the vehicle.  The authorized Ford dealership requested that plaintiff leave her vehicle with the dealership.

23.     On about December 10, 2014, plaintiff returned to the authorized Ford dealership in Weslaco, Texas, where dealership employees or agents informed plaintiff that

they were unable to duplicate the exhaust odor inside plaintiff's 2013 Ford Explorer.

Plaintiff requested that the service manager test drive the vehicle again with plaintiff in the

car.  The service manager sat in the rear of the vehicle.  Plaintiff and the service manager

both experienced the exhaust odor inside plaintiff's 2013 Ford Explorer, and on at least one

occasion, the service manager requested that the windows be lowered because the odor

was unbearable.

24.     Plaintiff continues to smell exhaust in the passenger compartment of her

2013 Ford Explorer while operating the vehicle in its normal and customary manner,

despite TSB 14-0130 having been performed twice.

25.     While plaintiff's vehicle was in the possession of the authorized Ford

dealership in Weslaco, Texas, on about December 1, 2014, plaintiff contacted Ford at (800)

392-3673 and spoke with a customer service representative.  After explaining the exhaust

odor issue to the customer service representative, plaintiff's complaint was escalated to a

customer service manager.  Plaintiff eventually spoke to "Debby," who plaintiff believes to

be a Ford regional service manager.  Plaintiff explained the exhaust odor present inside her

vehicle to Debby, to which Debby replied that plaintiff should not be concerned, and stated

that there was nothing Ford could do to help Lyliana.

26.     When the exhaust odor is present, plaintiff and her minor daughters often

become nauseated, develop headaches, feel dizzy and develop a burning sensation in their

eyes and stomach.

27.     Carbon monoxide is an odorless, colorless, and tasteless gas that is toxic to

humans.

6

28.     To date, Ford has not repaired plaintiff's 2013 Ford Explorer, nor has Ford acknowledged to plaintiff or the members of the proposed class that the 2011 through 2015 model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting exhaust, carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles.

## GENERAL ALLEGATIONS

### Ford's Sale and Leasing of Defective and Dangerous Vehicles

29.     Ford began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

30.     The subsequent model-year Ford explorers are not dramatically different in design from the 2011 Explorer. These Explorers, including those sold today, are all known as "fifth generation" Explorers.

31.     The 2011 through 2015 model year Ford Explorers were designed, engineered, and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while they are driven in a normal and customary manner.

32.     Ford designed, manufactured, assembled, inspected, distributed, sold, and leased the 2011 through 2015 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f) Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles; and,

(g) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

33.    Ford knew or should have known that the 2011 through 2015 model year Explorers were dangers and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

34.    The defective vehicles were sold or leased with express and implied warranties. These warranties assured consumers that the vehicles were free from defects and were properly equipped for the use for which they were intended. At the time the

8

defective vehicles were sold or leased by Ford directly and through its authorized agents, the vehicles were in violation of express and implied warranties. All of the defective vehicles are still within the effective dates of the express warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other factors.

35.     In promoting, selling and repairing its defective vehicles, Ford acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Ford representatives and agents.  That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services; (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

36.     Ford's control over the actions of its dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein.  Authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130.

**Ford Acknowledged the Subject Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130**

37.     In response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles, Ford issued TSB 12-12-4 in or about December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

38.     In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

39.     Despite issuing TSBs 12-12-4 and 14-0130, Ford did not inform plaintiff or the members of the proposed class of the defects in 2011 through 2015 model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

40.     TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor acknowledged is accompanied in the passenger compartment by carbon monoxide.

41.     At all material times, Ford has failed to inform customers who purchased and/or leased 2011 through 2015 model-year Ford Explorers that they are unsafe for operation or that they were designed, engineered, and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

42.     Additionally, TSBs 12-12-4 and 14-0130 do not identify a specific fix to the exhaust odor problem.  Rather, TSBs 12-12-4 and 14-0130 call for various replacements and/or repairs to several unrelated vehicle components. This demonstrates that Ford knew

of the defect, but did not know a specific, effective fix to protect occupants of the 2011 through 2015 model year Ford Explorers from exhaust and other gases, including carbon monoxide. Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 *hoping*, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

**Ford's TSBs 12-12-4 and 14-0130 Fails to Repair the Defects**

43.     Ford's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

44.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2015 model-year Ford Explorers, and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

45.     In TSBs 12-12-4 and 14-0130, Ford requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSB 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

46.     TSBs 12-12-4 and 14-0130 require that the dual rate air extractor replace the driver side rear air extractor initially installed on the subject vehicle. The rear air extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the

subject vehicles and enter the passenger compartment. Based upon information and belief, Ford requires the replacement of the driver side rear air extractor, and not the passenger-side rear air extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor. The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air conditioning system.

47.    The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE). The dual rate air extractor includes "living hinges" and plastic torsional springs that are intended to function as a one-way pneumatic valve.

48.    The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50. However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air conditioning systems and the passenger compartments of the subject vehicles. The replacement dual rate air extractors are thus ineffective, dangerous, and defective.

49.    In addition, Ford modifies the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130 by haphazardly adding a silicone-like substance to the uppermost of the three "living hinges." Based upon information and belief, the silicone-like substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its original manufacturer. Moreover, the silicone-like substance added by Ford to the dual rate air

extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

50.     Ford designed, manufactured, and engineered the 2011 through 2015 model-year Ford explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment. The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment. They are thus ineffective, dangerous, and defective.

51.     Ford designed, manufactured, and engineered the 2011 through 2015 model-year Ford explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles. Ford additionally designed, manufactured, engineered and assembled the 2011 through 2015 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines. Accordingly, TSBs 12-12-4 and 14-0130 require that the aforementioned joints, flange, and lines be sprayed with "generous amounts" of rubberized undercoating and seam sealer. However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

52.     TSB 14-0130 additionally requires the reprogramming of the HVAC module to the latest calibration.  Reprogramming the HVAC module, however, fails to prevent

exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

**Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class**

53.     Plaintiff and each member of the proposed class has been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly purchased or leased defective vehicles which cannot be safely operated, they unknowingly have been forced to pay, or will pay, substantial amounts of money to repair the vehicles, if a repair can be made, and the value of their affected vehicles has been diminished because of this defect.

54.     A vehicle containing the defect described herein – that is, a defect that permits entry of carbon monoxide and other gases into the passenger compartment of the vehicle – is worth less than a vehicle free from such defect. Given that the defect renders driving the subject vehicles a health hazard which is potentially deadly, the vehicles are valueless. At the time plaintiff purchased her vehicle, she paid a price based upon the value of such a vehicle free of such defect.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and the members of the following Class.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

56.     Plaintiff seeks to represent the following class:

All persons who purchased or leased in Texas at least one of the following vehicles: 2011 Ford Explorer, 2012 Ford Explorer, 2013 Ford Explorer, 2014 Ford Explorer or 2015 Ford Explorer.

57.   **Numerosity**.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, Ford has sold or leased tens of thousands of 2011 through 2015 model year Ford Explorers in Texas.  All of these vehicles are covered by TSBs 12-12-4 and 14-0130, and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

58.   **Existence of Common Questions of Law and Fact**.  Common questions of law and fact exist as to all members of the class.  These include, but are not limited to: whether the 2011 through 2015 model year Ford Explorers have been sold or leased subject to express and/or implied warranties; whether the 2011 through 2015 model year Ford Explorers are defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles; whether the 2011 through 2015 model year Ford Explorers suffer from a design defect, are unreasonable dangerous and/or are unfit for their intended use; whether Ford has knowledge of such defect; when Ford learned of such defect; whether Ford failed to disclose the defect to plaintiff and the class; whether Ford misrepresented that the affected vehicles were safe; whether Ford has a fix to the defect and, if so, how much the fix will cost; whether the defect reduces the value of the affected vehicles; whether Ford's express warranties cover the latent defects; whether Ford breached its warranties made to plaintiff and the class; whether Ford negligently designed/engineered/manufactured the affected vehicles; whether Ford concealed the defect; and whether plaintiff and the class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

59.     **Typicality**.  The claims of plaintiff are typical of the claims of the class, as plaintiff and the members of the class have purchased or leased defective vehicles and have been harmed in some manner by Ford's conduct.

60.     **Adequacy**.  Plaintiff will fairly and adequately protect the interests of the class. Plaintiff's interests do not conflict with the interests of the members of the class. Further, plaintiff has retained counsel competent and experienced in complex class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action.

61.     **Predominance and Superiority**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable.  Questions of law and fact common to the members of the class predominate over any questions affecting only individual members. Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

62.     The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for Ford. The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member. Further, plaintiff anticipates no difficulty in the management of this litigation as a class action.

16

63.     For all of the foregoing reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**BREACH OF EXPRESS WARRANTY
(TEX. BUS. & COM. CODE ANN. § 2-313)**

64.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 63 as if fully set forth herein.

65.     This count is brought on behalf of the class.

66.     For each defective vehicle sold by Ford, an express written warranty was issued which covered the vehicle, warranting the vehicle to be free of defects in materials and workmanship at the time of delivery.

67.     Ford's express warranties are intended to benefit the customer, including plaintiff and the members of the class.

68.     At all relevant times, Ford was and is a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE ANN. § 2-313.  As an express warrantor and manufacturer and merchant, Ford had certain obligations under TEX. BUS. & COM. CODE ANN. § 2-313 to conform the subject 2011 through 2015 model year Ford Explorers to the express warranties given by Ford.

69.      When plaintiff and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, material and workmanship.  Ford promised to pay for all repairs and parts to replace defects introduced during the design and manufacturing process.

17

70.     Plaintiff, and the members of the class, relied upon Ford's express warranties, and the existence of such warranties, when purchasing or leasing the vehicles.

71.     Ford breached its express warranties by offering for sale, and selling or leasing as safe, defective vehicles that were by design and construction unsafe, thereby subjecting occupants of the defective vehicles purchased or leased by plaintiff and members of the class to the risk of injury or death.

72.     The defect at issue in this litigation was present in the subject vehicles at the time of sale or lease to plaintiff and the members of the class.

73.     The defect at issue in this litigation must be corrected by Ford, and the expenses of such repairs must be borne by Ford, per Ford's express warranties.

74.     Ford breached its express warranties (and continues to breach its express warranties) because it has not fixed the defect causing carbon monoxide and exhaust to enter the passenger compartment of the subject vehicles, nor has it covered the expenses associated with correcting the defect.

75.     Plaintiff and the members of the class have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's conduct described throughout this Complaint.

76.     Any arbitration or class waiver provisions included in Ford's express warranties are substantively and procedurally unconscionable, and therefore, unenforceable.

77.     Ford has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Ford has failed and refused to offer an effective remedy.

78.     Plaintiff and the members of the class have suffered damages caused by Ford's breach of the express warranties and are entitled to recover compensatory damages, including but not limited to the cost of repairs and diminution in value.

## COUNT II

### BREACH OF IMPLIED WARRANTY
### (TEX. BUS. & COM. CODE ANN. § 2-314)

79.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 63 as if fully set forth herein.

80.     This Count is brought on behalf of the class.

81.     At all relevant times, Ford was and is a merchant with respect to motor vehicles under TEX. BUS. & COM. CODE ANN. § 2-314.

82.     Ford impliedly warranted that the subject vehicles, which Ford designed, manufactured, sold or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers.  The ordinary purpose for which the subject vehicles are used is, among other things, to drive in a manner that does not unnecessarily and unreasonably expose occupants to needless harm or risk.

83.     Ford breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2015 model year Ford Explorers in an unsafe and un-merchantable condition.  The subject vehicles threaten to expose occupants to carbon monoxide and other dangerous gases while the vehicles are

being driven in a normal and customary manner.  The subject vehicles were therefore unfit for their ordinary purpose.

84.     Plaintiff and each of the members of the class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and plaintiff and each of the members of the class, on the other hand.  Notwithstanding, privity is not required because plaintiff and each of the members of the class are the intended beneficiaries of Ford's written warranties and its contractual relationships with Ford dealerships. The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford.  Ford's express warranties were designed for and intended to benefit the consumers only.  Plaintiff and the members of the class were the intended consumers of the subject vehicles.

85.     Ford has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Ford has failed and refused to offer an effective remedy.

86.     Plaintiff and the members of the class have suffered damages caused by Ford's breach of the implied warranty of merchantability and are entitled to recover compensatory damages, including but not limited to the cost of repairs and diminution in value.

**COUNT III**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**

87.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 63 as if fully set forth herein.

88.     This Count is brought on behalf of the class.

89.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

90.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

91.     The subject 2011 through 2015 model-year Ford Explorers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

92.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by, among other things, the failure of a warrantor to comply with written or implied warranties.

93.     Ford sells and leases its vehicles subject to express warranties which are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   Ford additionally sells and leases its vehicles subject to implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

94.     When plaintiff and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

95.     When plaintiff and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used,

including the guarantee that they were in a safe and non-defective condition for use by

owners and lessees, and were not otherwise injurious to consumers.  Ford was under a

duty to design, construct, manufacture, inspect and test the vehicles so as to make them

suitable for the ordinary purpose of their use.

96.     The subject 2011 through 2015 model year Ford Explorers share a common

defect in that they have been designed and manufactured such that exhaust and other

gases, including carbon monoxide, may enter the passenger compartment of such vehicles

during their normal and customary use.  Ford is aware of the defect, and has acknowledged

the problem of an exhaust odor inside the passenger compartment of such vehicles by its

issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not

disclose the presence of carbon monoxide inside the passenger compartment of the subject

vehicles, nor do they fix the problem of exhaust and other gases entering the passenger

compartment.  Ford has breached its express and implied warranties by failing to disclose a

life safety defect in the subject vehicles, by failing to fix the defects in the subject vehicles,

and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for

which they are intended to be used.

97.     Plaintiff and each of the members of the class have had sufficient direct

dealings with either Ford or its agent dealerships to establish privity of contract between

Ford, on the one hand, and Plaintiff and each of the members of the class, on the other

hand.  Notwithstanding, plaintiff and each of the members of the class are the intended

beneficiaries of Ford's express and implied warranties.  The dealers were not intended to

be the ultimate consumers of the subject vehicles, and have no rights under the warranty

agreements provided by Ford.  Ford's warranties were designed for and intended to benefit the consumers only.

98.     Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject vehicles' defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles.  Notwithstanding, Ford has failed to disclose the existence of this defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.  Plaintiff, on numerous occasions, afforded Ford an opportunity to cure by bringing her vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment.  Notwithstanding, the defect in plaintiff's vehicle was not repaired.  Neither TSB 12-12-4 nor TSB 14-0130 repairs the defect.  Under the circumstances, any requirement that plaintiff afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

99.     The amount in controversy of plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

100.     Plaintiff, individually and on behalf of the other class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## COUNT IV

**VIOLATION OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT
TEX. BUS. & COM. CODE ANN. §§ 17.41 *et seq.***

101.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 86 as if fully set forth herein.

102.    This Count is brought on behalf of the class.

103.    Plaintiff and the members of the class are "consumers" within the meaning of the Texas Deceptive Trade Practices – Consumer Protection Act ("DTPA") § 17.45.

104.    Ford engaged in trade or commerce in Texas within the meaning of DTPA § 17.45.

105.    DTPA § 17.50(a)(2) affords consumers a private right of action when a breach of express or implied warranty constitutes a producing cause of economic damage.

106.    Ford sells and leases its vehicles subject to express and implied warranties within the meaning of DTPA § 17.50.

107.    When plaintiff and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

108.    When plaintiff and members of the class purchased and/or leased their 2011 through 2015 model year Ford Explorers, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by

24

owners and lessees, and were not otherwise injurious to consumers.  Ford was under a

duty to design, construct, manufacture, inspect and test the vehicles so as to make them

suitable for the ordinary purpose of their use.

109.    The subject 2011 through 2015 model year Ford Explorers share a common

defect in that they have been designed and manufactured such that exhaust and other

gases, including carbon monoxide, may enter the passenger compartment of such vehicles

during their normal and customary use.  Ford is aware of the defect, and has acknowledged

the problem of an exhaust odor inside the passenger compartment of such vehicles by its

issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not

disclose the presence of carbon monoxide inside the passenger compartment of the subject

vehicles, nor do they fix the problem of exhaust and other gases entering the passenger

compartment.  Ford has breached its express and implied warranties by failing to disclose a

life safety defect in the subject vehicles, by failing to fix the defects in the subject vehicles,

and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for

which they are intended to be used.

110.    Plaintiff and each of the members of the class have had sufficient direct

dealings with either Ford or its agent dealerships to establish privity of contract between

Ford, on the one hand, and Plaintiff and each of the members of the class, on the other

hand.  Notwithstanding, plaintiff and each of the members of the class are the intended

beneficiaries of Ford's express and implied warranties.  The dealers were not intended to

be the ultimate consumers of the subject vehicles, and have no rights under the warranty

agreements provided by Ford. Ford's warranties were designed for and intended to benefit the consumers only.

111.    Ford has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Ford has failed and refused to offer an effective remedy.

112.    Ford's breach of its express and implied warranties constitutes a producing cause of economic damage to Plaintiff and the members of the class.

113.    Plaintiff, individually and on behalf of the other class members, seeks all damages permitted by law, including without limitation diminution in value of their vehicles and all additional amounts permitted under DTPA § 17.50, in an amount to be proven at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, respectfully requests judgment against Ford:

(a)    Certifying the class and appointing plaintiff and her counsel to represent the class;

(b)    Ordering Ford to provide notice to the class of the defect with the design of the vehicles, and/or the exhaust and/or HVAC systems in the 2011 through 2015 model year Ford Explorers that causes carbon monoxide and exhaust to enter into the passenger compartments of such vehicles during their normal and customary use;

(c)    Ordering Ford to promptly repair and/or replace, free of charge, all subject vehicles to prevent carbon monoxide and exhaust from entering the passenger compartments of such vehicles; or ordering Ford to offer rescission to plaintiff and the

members of the class by returning the full costs paid to purchase or lease the defective

vehicles in exchange for the return of the defective vehicles;

(d)     Awarding damages which include, but are not limited to, the cost of any

repairs and the diminution of value of the vehicles;

(e)     Awarding pre-judgment and post-judgment interest;

(f)     Awarding attorneys' fees and costs; and

(g)     Awarding any such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Dated: January 14, 2015.

_____/s/ Frank Costilla_____
**Attorney in Charge**
**Law Office of Frank Costilla**
Frank Costilla, Esq.
Texas Bar No. 04856500
Federal ID No. 1509
5 E. Elizabeth Street
Brownsville, TX 78520
frank@costillalaw.com

**Kelley/Uustal, PLC**
John J. Uustal, Esq.
Florida Bar No.
jju@kulaw.com
Jordan M. Lewis, Esq.
Florida Bar No. 0097997
jml@kulaw.com
Michael A. Hersh, Esq.
Florida Bar No. 0056019
mah@kulaw.com
700 S.E. 3rd Ave., Suite 3000
Fort Lauderdale, Florida 33316
Phone: (954) 522-6601
Fax: (954) 522-6608

27

(Motions for Pro Hac Vice Admission
Intended)

*Attorneys for Plaintiff Lyliana Salinas*